UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| RICHARD GARRIOTT, § § § Plaintiff, § § v. § § NCSOFT CORPORATION, § § Defendant. § § | Civil Action No. _____ A09CA 357SS |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, Richard Garriott ("Mr. Garriott" or "Plaintiff"), by and through the undersigned counsel, brings this action against Defendant, NCsoft Corporation ("NCsoft" or "Defendant"), and would respectfully show the Court as follows:

### I.   INTRODUCTION

Richard Garriott is a pioneer in the computer gaming industry. NCsoft is a Korean computer gaming company. In or about June 2001, NCsoft acquired Mr. Garriott's company, issued stock options to Mr. Garriott as part of the acquisition, and began to employ him. Several years into that relationship, however, NCsoft breached its stock option agreement with Mr. Garriott and/or sought to defraud Mr. Garriott of the value of those options. Mr. Garriott brings this action to redress that breach of the multi-million dollar option contract, or in the alternative, to recover damages for the multi-million dollar fraud perpetrated on him by NCsoft.

In or about November 2008, Chris Chung, President of NCsoft's North American operations, informed Mr. Garriott that NCsoft had decided to "part company."

Although Mr. Garriott objected to his dismissal, Mr. Chung insisted that the decision was final—Mr. Garriott had to go.

As Mr. Garriott prepared to leave NCsoft, however, Mr. Garriott learned that NCsoft had internally re-characterized his termination by Mr. Chung as a "voluntary" resignation from the company. This mischaracterization had potentially profound and detrimental effects on Mr. Garriott's stock options: if NCsoft terminated Mr. Garriott's employment (which it did), then the options—*worth tens of millions of dollars*—would remain in effect until June 2011; but if Mr. Garriott resigned voluntarily (which he did not), then NCsoft might have terminated those options—***worth tens of millions of dollars***—unless Mr. Garriott exercised the options within ninety days of his departure.

Though Mr. Garriott told NCsoft that it was mischaracterizing his departure and told NCsoft about the problems that the mischaracterization could cause, NCsoft refused to correct the misstatements. Instead, NCsoft forced Mr. Garriott into the Hobson's choice of exercising his options prematurely or risking that NCsoft would refuse to honor the options later. In reliance on NCsoft's statements and rather than risk losing the options entirely, Mr. Garriott exercised the options within the ninety day window. This forced exercise caused Mr. Garriott to lose the remaining 2 1/2 years of his option period and forced him to sell into one of the worst equity markets in modern history. Indeed, NCsoft's actions forced Mr. Garriott prematurely to incur ***hundreds of thousands of dollars in costs*** and tax liabilities associated with the exercise, to lose ***millions of dollars in value*** associated with the remaining 2 1/2 year option, and to sell

*tens of millions of dollars of NCsoft shares* during one of the worst global economic downturns since the Great Depression.

To redress these injuries, Mr. Garriott brings claims for breach of contract, fraud, and/or negligent misrepresentation in this lawsuit and seeks to recover his actual damages, exemplary damages, consequential damages, pre- and post- judgment interest, attorneys' fees and costs, and such other and further relief to which he may be justly entitled.

## II.   THE PARTIES

1. Plaintiff Richard Garriott is an individual resident of Austin, Texas.

2. Defendant NCsoft Corporation is a corporation organized under the laws of the Republic of Korea with its principal place of business in Seoul, South Korea. NCsoft maintains offices, and is registered to do business, in the State of Texas and may be served through its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 701 Brazos Street, Suite 1050, Austin, TX 78701. In addition or in the alternative, NCsoft may be served at its registered offices and regular place of business in the State of Texas at 6801 N. Capital of Texas Hwy, Suite 102, Austin, TX 78731.

## III.   JURISDICTION AND VENUE

3. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States or citizens of a State and citizens or subjects of a foreign state.

4. Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims at issue occurred in this district.

5. This Court has personal jurisdiction over NCsoft. NCsoft is registered to do business in Texas, maintains a registered agent for service in this State, and will be served in Texas through that registered agent. Furthermore, the Court has jurisdiction over NCsoft because: (1) NCsoft has transacted and continues to transact business in Texas; (2) the causes of action asserted in this case arose from or are connected with purposeful and tortious acts committed by NCsoft, in whole or in part, in Texas; (3) NCsoft has committed a tort, directly and indirectly, in whole and in part, that caused substantial harm in Texas; and/or (4) NCsoft has had continuous and systematic contacts with Texas by engaging in numerous activities that have had an effect in this State.

## IV. BACKGROUND FACTS

**A.   Richard Garriott is a Pioneer in the Computer Gaming Industry.**

6. While a student at the University of Texas at Austin in the early-1980's, Mr. Garriott was among the first computer programmers to develop and market a successful series of computer role-playing games for consumers. Mr. Garriott's games are among the longest running, most successful and most influential computer gaming franchises of their kind ever created.

7. With his brother, Robert Garriott, and others, Mr. Garriott founded the computer gaming company, Origin Systems, Inc. ("Origin Systems"), in the early 1980's

and ran that company for nearly a decade. By the early 1990's, Origin System's success with *Ultima, Wing Commander* and other games aroused the interest of Electronic Arts, Inc. ("EA") which acquired Origin Systems in 1992.

8. Mr. Garriott worked with EA for several years after the acquisition of Origin Systems, and after leaving EA, Mr. Garriott, his brother and others formed another computer gaming company, Destination Games, Inc. ("Destination Games") in 2000.

### B. NCsoft Acquired Mr. Garriott's Company and Issued Stock Options to Mr. Garriott.

9. In June 2001, NCsoft acquired Destination Games from Mr. Garriott and its other founders.

10. NCsoft, a Korean computer gaming company, had little presence in North America at the time, and NCsoft retained Mr. Garriott and others from Destination Games to help accelerate NCsoft's entry into the massively multi-player online ("MMO") computer gaming market that was developing in North America. The MMO gaming market, which includes such popular and well-known games as *World of Warcraft* and *Second Life*, is one of the fastest growing segments of the computer gaming market.

11. As part of the acquisition of Destination Games, NCsoft issued stock options to Mr. Garriott. A true and correct copy of the Stock Option Agreement between NCsoft and Mr. Garriott is attached hereto as Exhibit "A."

12. Pursuant to the terms of the Stock Option Agreement, NCsoft granted stock options to Mr. Garriott effective May 30, 2001. Those options vested over a period of two years and were to remain valid and exercisable for ten-years from the effective date of issuance.

13. Under certain limited circumstances, the Stock Option Agreement allowed the NCsoft Board of Directors to resolve to terminate the Stock Option Agreement and to cancel all of the options granted under that agreement.

14. Among the circumstances permitting NCsoft's Board to resolve to terminate the Stock Option Agreement was the voluntary termination by Mr. Garriott of his employment with NCsoft.

15. Specifically, if Mr. Garriott voluntarily resigned and the Board resolved to terminate the Stock Option Agreement, Mr. Garriott's options would be cancelled ninety (90) days after the voluntary termination of his employment pursuant to the terms of the Stock Option Agreement.

16. Beginning in 2001, Mr. Garriott worked with NCsoft to expand and develop its MMO gaming platforms in North America. Among other things, Mr. Garriott advised and assisted in NCsoft's acquisition and development of the *Guild Wars* and *City of Heroes* game franchises. Mr. Garriott also served as the Executive Producer of *Richard Garriott's Tabula Rasa*, a space-themed MMO game for NCsoft, and was responsible for managing a team of developers, programmers and graphic artists at NCsoft's Austin, Texas facilities.

C.  **In 2008, Mr. Garriott Took a Working Leave of Absence from NCsoft to Travel to the International Space Station.**

17. Following the launch of the *Tabula Rasa* game, Mr. Garriott took a leave of absence from most of his duties at NCsoft to pursue a different kind of launch. As the son of a Skylab astronaut, Mr. Garriott had long dreamed of following his father into space. When the Russian government opened its space program to civilian travelers in the mid-2000's, Mr. Garriott placed his name on the list. In early 2008, Mr. Garriott learned that he had been selected to travel aboard a Soyuz spacecraft to the International Space Station later that year.

18. Mr. Garriott, of course, consulted with NCsoft's management before finally agreeing to take the spaceflight. With the *Tabula Rasa* game up and running and Mr. Garriott between major projects, NCsoft's management approved Mr. Garriott's request for a working leave of absence.

19. Mr. Garriott remained an NCsoft employee (though at a reduced salary) while undergoing the pre-flight, flight and post-flight procedures, most of which occurred at Russian facilities. Mr. Garriott also remained in close contact with his development and operations team in Austin, Texas during that time, working with them to address strategic and technical issues associated with the *Tabula Rasa* game.

20. Moreover, Mr. Garriott used the considerable media coverage surrounding his space-launch to publicize and promote *Tabula Rasa* (a space-themed game) for NCsoft. For example, Mr. Garriott sent a coded message to the *Tabula Rasa* player-base during his space launch, and he carried the sequenced DNA code of certain

celebrities, including Stephen Hawking and Stephen Colbert, with him into space in an NCsoft promotion dubbed "Operation Immortality."

**D.   NCsoft Terminated Mr. Garriott's Employment While He Was Still in Quarantine from the Space Flight.**

21.   Mr. Garriott returned to Earth in late-October 2008 after a successful stint aboard the International Space Station.  While Mr. Garriott was still in post-flight quarantine in Russia, however, the head of NCsoft's North American studios, Chris Chung ("Mr. Chung"), informed Mr. Garriott in a telephone call that Mr. Garriott's time at NCsoft was "over" and that NCsoft had decided that it was time for them to "part ways."  Mr. Garriott protested his dismissal, but Mr. Chung stated that NCsoft's upper management had already considered the matter, that Mr. Garriott's time at NCsoft was over, and that it was time for Mr. Garriott to go.

22.   Shortly after the "quarantine call," NCsoft prepared and presented an "open letter" to Mr. Garriott, announcing Mr. Garriott's departure from the company. That letter was drafted by NCsoft but purported to be from Mr. Garriott to the *Tabula Rasa* players.  The letter announced that Mr. Garriott was "leaving NCsoft to pursue [new] interests."  Though NCsoft's letter omitted details about the circumstances surrounding Mr. Garriott's departure, Mr. Garriott saw no reason at the time to object to those omissions, and he did not object to NCsoft posting the letter on the *Tabula Rasa* website.

23.   With the benefit of hindsight, however, it appears that NCsoft's "open letter" was a prelude to the wrongful conduct by NCsoft to come.

E. **NCsoft Re-Characterized Mr. Garriott's Termination as a Voluntary Departure, Depriving Mr. Garriott of the Full Value of His Stock Options.**

24. Within days after Mr. Garriott's return to Earth, the "quarantine call," and NCsoft's "open letter," NCsoft announced that it was shutting down the *Tabula Rasa* game and furloughing the *Tabula Rasa* team.

25. As Mr. Garriott prepared to leave NCsoft, he sought to confirm with NCsoft's Human Resources department that his termination was involuntary. Specifically, Mr. Garriott spoke with Linda Powers, NCsoft's Human Resources manager in Austin, Texas, and informed her that he did not voluntarily resign, he was asked to leave by Mr. Chung.

26. Mr. Garriott was careful to confirm with NCsoft's Human Resources department that his termination was "involuntary" because, as discussed above, the nature of his departure (whether voluntary or involuntary) might effect Mr. Garriott's ability to continue to hold, and later to exercise, his NCsoft stock options under the Stock Option Agreement.

27. In response to Mr. Garriott's initial inquiries, NCsoft's Human Resources Manager, Linda Powers, instructed Mr. Garriott to direct any questions about his stock options to NCsoft's Chief Financial Officer, Lee Jae-ho. Ms. Powers did not, however, inform Mr. Garriott that NCsoft was internally classifying his termination as "voluntary."

28. As instructed by Ms. Powers, Mr. Garriott contacted Mr. Lee. Mr. Lee, however, told Mr. Garriott that he was unaware that Mr. Garriott was leaving the

company, contradicting Mr. Chung's earlier statement to Mr. Garriott that NCsoft's upper management had approved his termination.

29. After speaking with Mr. Lee, Mr. Garriott again asked Ms. Powers about the classification of his termination, and Ms. Powers informed Mr. Garriott that she considered his termination to be part of the involuntary reduction in force ("RIF") of the *Tabula Rasa* team. In fact, Ms. Powers had not classified Mr. Garriott's departures as "involuntary" or as part of a RIF. Ms. Powers had actually characterized Mr. Garriott's termination in NCsoft documents as a "voluntary" departure after speaking with Mr. Chung.

30. As discussed above, this mischaracterization by NCsoft had a potentially profound and detrimental effect on Mr. Garriott's vested rights under the Stock Option Agreement.

31. Mr. Garriott objected upon learning that NCsoft had mischaracterized his departure as "voluntary." Mr. Garriott again informed Ms. Powers that he had not resigned voluntarily and that Mr. Chung had terminated his employment.

32. Despite being informed by Mr. Garriott that NCsoft had incorrectly characterized the nature of this departure, Ms. Powers did not correct the mischaracterization. Instead, NCsoft management—including, upon information and belief, Mr. Chung who knew that the characterization was false—instructed Ms. Powers not to correct the error.

33. Concerned about the possible effect of the mischaracterization, Mr. Garriott repeatedly informed NCsoft personnel that he had not resigned voluntarily—he was forced out by Mr. Chung.

34. Mr. Garriott also sought assurance from NCsoft that the company would honor his options for the full ten-year term that he had negotiated as part of NCsoft's acquisition of Destination Games.

35. In response, NCsoft personnel, including Ms. Powers and Jason Lee, continued to represent that Mr. Garriott had resigned voluntarily (despite Mr. Garriott's insistence to the contrary) and that his options would be cancelled if not exercised within 90 days.

36. On information and belief, the NCsoft Board of Directors had not actually passed a resolution to terminate Mr. Garrriott's Stock Option Agreement at any time before February 2009.

37. Despite Mr. Garriott's repeated objections, NCsoft refused to retract its misstatements regarding the nature of Mr. Garroitt's departure and the cancellation of his stock options.

38. Because NCsoft failed to correct its mischaracterization of the circumstances surrounding Mr. Garriott's departure, because NCsoft refused to provide the requested assurance that it would honor its agreement with Mr. Garriott, and because NCsoft repeatedly stated that it would cancel Mr. Garriott's options if he did not exercise them within 90 days of his departure from the company, Mr. Garriott

exercised the options in February 2009, nearly 2 1/2 years before they were scheduled to expire to help to mitigate the damage from NCsoft's wrongdoing.

39. As a result of the forced exercise, Mr. Garriott lost the value of the remaining option period, prematurely incurred numerous expenses (including tax liabilities), and was forced to sell his shares in one of the worst economic downturns in recent history. To date, Mr. Garriott has suffered _more than $27,000,000.00 in actual damage_ as a result of NCsoft's wrongdoing.

## V. CAUSES OF ACTION

### FIRST CAUSE OF ACTION – BREACH OF CONTRACT

40. Mr. Garriott realleges the preceding paragraphs as if fully set forth herein.

41. A valid and enforceable contract existed between Mr. Garriott and NCsoft, *i.e.*, the Stock Option Agreement.

42. All conditions precedent to Mr. Garriott's right to bring this action and to recover the requested relief have been performed, have occurred, or have been waived.

43. Chris Chung, the President of NCsoft's North American operations, told Mr. Garriott that his time at NCsoft was "over" and that NCsoft wanted to "part ways."

44. Mr. Chung's statements were truthful, and NCsoft thereby terminated Mr. Garriott's employment.

45. Mr. Garriott sought assurance that NCsoft would continue to perform under the Stock Option Agreement following his termination.

46. NCsoft repudiated the Stock Option Agreement when it refused/failed to provide the requested assurances, thereby breaching the Stock Option Agreement.

47.    As a direct and proximate result of NCsoft's breach of the Stock Option Agreement, Mr. Garriott was deprived of the benefit of his bargain and has suffered, and will continue to suffer, economic damages.

48.    Because NCsoft breached the Stock Option Agreement, Mr. Garriott has been required to retain counsel at Fish & Richardson P.C. to prosecute his claims. Mr. Garriott has agreed to pay his counsel for the reasonable attorneys' fees and expenses incurred on his behalf in this lawsuit. Mr. Garriott has presented his claims to NCsoft, and NCsoft has refused to honor their contract with him. Pursuant to Texas Civil Practices & Remedies Code § 38.001(8), Mr. Garriott is entitled to recover his reasonable and/or necessary attorneys' fees and costs incurred in the prosecution of this lawsuit.

## SECOND CAUSE OF ACTION – FRAUD

49.    Mr. Garriott realleges the preceding paragraphs as if fully set forth herein.

50.    Chris Chung, the President of NCsoft's North American operations, told Mr. Garriott that his time at NCsoft was "over" and that NCsoft wanted to "part ways."

51.    Mr. Chung's statements were truthful, and NCsoft thereby terminated Mr. Garriott's employment.

52.    NCsoft created false documentation indicating that Mr. Garriott had voluntarily resigned from his employment.

53.    NCsoft employees treated Mr. Garriott as though he had voluntarily resigned and stated that NCsoft was entitled to cancel Mr. Garriott's options within ninety days of his termination.

54. The representations by NCsoft employees regarding the circumstances and effect of Mr. Garriott's departure were false.

55. At the time that NCsoft employees made these representations, Mr. Garriott had not voluntarily resigned.

56. At the time that NCsoft employees made these representations, all conditions precedent to cancellation of Mr. Garriott's options had not occurred.

57. At the time that NCsoft employees made these representations, the NCsoft Board of Directors had not passed a resolution terminating the Stock Option Agreement.

58. NCsoft either knew that the representations of its employees were false or it was reckless as to the truth of those statements.

59. NCsoft intended for Mr. Garriott to rely on those false statements by NCsoft employees.

60. In reasonable and justifiable reliance on the statements of NCsoft employees, Mr. Garriott exercised his options nearly 2 1/2 years before they were set to expire, causing him to suffer actual economic damage.

61. Defendants' fraudulent conduct described herein further warrants the imposition of exemplary damages.

## THIRD (ALTERNATIVE) CAUSE OF ACTION – FRAUD

62. Mr. Garriott realleges the preceding paragraphs as if fully set forth herein and alleges the following, third cause of action in the alternative to the prior causes of action.

63. Chris Chung, the President of NCsoft's North American operations, told Mr. Garriott that his time at NCsoft was "over" and that NCsoft wanted to "part ways."

64. Mr. Chung's statements were material and false.

65. Mr. Chung knew that the statements were false, and he intended for Mr. Garriott to rely on those statements.

66. The actions and knowledge of the President of NCsoft's North American operations, Mr. Chung, are imputed to NCsoft.

67. In reasonable and justifiable reliance on Mr. Chung's statements, Mr. Garriott left his employment with NCsoft.

68. NCsoft's fraudulent conduct described herein caused Mr. Garriott to lose the approximately 2 1/2 years remaining in the option period and to incur additional costs, causing him to suffer actual economic damage.

69. NCsoft's fraudulent conduct described herein further warrants the imposition of exemplary damages.

## FOURTH CAUSE OF ACTION – NEGLIGENT MISREPRESENTATION

70. Mr. Garriott realleges the preceding paragraphs as if fully set forth herein.

71. NCsoft made numerous misrepresentations as described above.

72. NCsoft did not exercise reasonable care in communicating this information to Mr. Garriott, to NCsoft employees and to others or in ensuring the accuracy of the information communicated.

73. Mr. Garriott justifiably relied on the representations of NCsoft in deciding to exercise his options nearly 2 1/2 years before those options were set to expire.

74. NCsoft's misrepresentations proximately caused Mr. Garriott to suffer commercial damage recoverable in this action.

## VI. JURY DEMAND

75. Mr. Garriott hereby demands trial by jury of all issues so triable.

## VII. PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Richard Garriott respectfully requests that NCsoft Corporation be cited to appear and answer, and that upon final trial, the Court find judgment for Mr. Garriott and against NCsoft as follows:

   a. As a result of NCsoft's wrongful actions, for Mr. Garriott for actual damages, consequential damages, exemplary damages, multiple damages, pre- and post-judgment interest, costs, and reasonable attorneys' fees; and

   b. For such other and further relief to which Mr. Garriott may show himself justly entitled, in law or in equity.

Dated: May 5, 2009.

Respectfully submitted,

FISH & RICHARDSON P.C.

By: _____
Stephen E. Fox
Texas Bar No. 07337260
sfox@fr.com
Kelly D. Hine
Texas Bar No. 24002290
hine@fr.com

1717 Main Street, Suite 5000
Dallas, TX 75201
(214) 747-5070 (Telephone)
(214) 747-2091 (Facsimile)


Alan D. Albright
Texas Bar No. 00973650
albright@fr.com
William Tommy Jacks
Texas Bar No. 10452000
jacks@fr.com

One Congress Plaza, Suite 810
111 Congress Avenue
Austin, Texas 78701
(512) 472-5070 (Telephone)
(512) 320-8935 (Facsimile)

Attorneys for Plaintiff
RICHARD GARRIOTT