IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| RICHARD GARRIOTT, | § | |
| Plaintiff, | § § § | |
| v. | § § | CIVIL ACTION NO. A-09-CA-357-SS |
| NCSOFT CORPORATION, | § § § | |
| Defendant. | § § § | |

**DEFENDANT NCSOFT CORPORATION'S MOTION FOR A NEW TRIAL OR, IN THE ALTERNATIVE, TO ALTER OR AMEND THE JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 59, Defendant NCsoft Corporation ("NCsoft") hereby moves for a new trial or, in the alternative, to alter or amend the judgment.

**INTRODUCTION**

NCsoft is entitled to a new trial on Plaintiff's breach of contract claim because the Court did not properly instruct the jury on the applicable law. Specifically, the Court failed to instruct the jury that, under South Korean law, which is the law applicable to Plaintiff's breach of contract claim, an employee's decision to resign from his employment can be considered involuntary **only if** there is evidence of "coercion" or "intimidation" on the part of the employer. Instead, the Court instructed the jury that Plaintiff's resignation could be considered involuntary if NCsoft had a "unilateral intent" to terminate him and gave him "no option but to resign." The jury concluded that NCsoft's conduct met the lower "unilateral intent" and "no option but to resign" standard, as there was no evidence introduced at trial from which the jury could have reasonably concluded that NCsoft had "coerced" or "intimidated" Plaintiff.

Further, NCsoft is entitled to a new trial for the independent reason that the amount of damages the jury awarded was not supported by the evidence. The jury awarded Plaintiff $28 million, apparently based on the assumption that Plaintiff would have exercised his stock options and sold the shares he obtained at the same time as his brother, Robert Garriott, if he had been given the opportunity. There was no evidence introduced at trial that Plaintiff would

have exercised his options and sold his shares at the same time as his brother. Indeed, Plaintiff did not testify that he would have done so. Alternatively, the Court should alter or amend the judgment to reduce the damages awarded to $1.8 million, which constitutes the reduction in value of Plaintiff's stock options caused by NCsoft's purported breach of contract, *i.e.*, the "ordinary damages" that Plaintiff may have incurred in this case.

## FACTUAL BACKGROUND

Plaintiff asserted four claims for relief in this action. *See* Plaintiff's Original Complaint ("Complaint" or "Compl.") ¶¶ 40-74. All of Plaintiff's claims arose out of his Stock Option Agreement with NCsoft (the "SOA"), which provided that Plaintiff would have until May 30, 2011, to exercise his NCsoft stock options unless he voluntarily terminated or resigned from his employment, in which case he would have only 90 days from his last day of employment to exercise them. *See id.* ¶¶ 12-15, 40-74.

Plaintiff's last day of employment at NCsoft was November 11, 2008. Plaintiff alleged that NCsoft breached the SOA by erroneously classifying his departure as a voluntary resignation, and informing him that he had only 90 days to exercise his options. *See* Compl. ¶¶ 38, 41-48. Plaintiff claimed that he did not voluntarily resign from NCsoft, and that instead the Company fired him. *See id.* ¶¶ 21, 43-44. Plaintiff nevertheless exercised all of his stock options in February 2009, and sold almost all of the shares he obtained at around the same time, even though he needed to sell only about half of the shares to repay his option loans. *See* Transcript of Trial on the Merits ("Trial Tr."), vol. 2, 64:9 – 66:20, 70:6 – 71:9, 107:20 – 108:5. Plaintiff realized a net gain of approximately $13.8 million on the sale of his shares. *See* Trial Tr., vol. 3, 31:7-12. Despite the enormous profit he received, Plaintiff claimed that he could have made even more money if he had been allowed to exercise his options at a later time.

Trial began on July 26, 2010. During Plaintiff's case-in-chief, Plaintiff's brother, Robert Garriott, testified that (i) he was a former employee of NCsoft; (ii) he had entered into a stock option agreement with NCsoft that was virtually identical to the SOA; (iii) his stock option agreement with NCsoft gave him the same number of options that Plaintiff had received

**DEFENDANT NCSOFT CORPORATION'S**
**MOTION FOR A NEW TRIAL OR, IN THE**
**ALTERNATIVE, TO ALTER OR AMEND**
**THE JUDGMENT**

**PAGE 2**

under the SOA; (iv) he exercised all of his stock options "in June of '09"; and (v) he sold all of the shares he obtained "in July and August." *See* Trial Tr., vol. 2, 221:21 – 222:13.  After Robert Garriott finished his testimony, Plaintiff's expert witness on damages, Dr. E. Allen Jacobs, testified that if Plaintiff had exercised his stock options in June 2009 (*i.e.*, at the same time as Robert), and then sold the shares he obtained "evenly across July and August," he would have received a net gain of approximately $42 million, which is $28.2 million more than he actually received by exercising his options and selling his shares in the manner that he did. *See* Trial Tr., vol. 3, 28:23 – 31:22.  Notably, Dr. Jacobs did not include this potential measure of damages in the expert reports and amendments thereto that Plaintiff submitted prior to trial. Instead, Plaintiff's counsel elicited this late-breaking theory from Dr. Jacobs in response to NCsoft's cross-examination of Dr. Jacobs concerning the three proposed measures of damages that he did include in his reports.  *See* Trial Tr., vol. 2, 297:1 – 300:23; vol. 3, 4:22 – 7:18; 28:23 – 31:22.

On July 28, 2010, after Plaintiff completed his case-in-chief, NCsoft moved for judgment as a matter of law on all of Plaintiff's claims.  *See* Dkt. No. 156.  The Court granted NCsoft's motion as to Plaintiff's claims for fraud and negligent misrepresentation, but reserved ruling on the breach of contract claim, which the Court ultimately submitted to the jury.

The next day, July 29, 2010, the Court provided the parties with copies of the proposed jury instructions.  The proposed instructions included the following definition of "voluntary resignation":

> Voluntary resignation means an employee ended his employment based on a decision he made of his own free will.  For instance, if an employee ended his employment after considering the various facts and circumstances that relate to his particular situation, such as the pros and cons of resigning versus the pros and cons of continuing service, and thereafter decided that resignation was the best option available to him at the time, then the resignation was of his own free will and voluntary.  <u>On the other hand, if an employer had a unilateral intent to terminate the employee and gave the employee no option but to resign, then resignation is not of his own free will and involuntary</u>.
>
> <u>Even if an employer induces an employee to submit a resignation letter, the dismissal is not considered voluntary if it was based on the employer's unilateral intent to end the employment, not the employee's free will</u>.  However, if the employer raised the possibility of the employee resigning, by suggesting or

> recommending that he do so, the resignation may still be voluntary if the employee's decision to resign is of his own free will and he determines it is the best option available to him at the time.

Dkt. No. 161 at 6 (emphasis added).

NCsoft objected to the proposed jury instructions on the ground that the definition of "voluntary resignation" misstated South Korean law, which the Court had previously determined is the law that governs Plaintiff's breach of contract claim. *See* Dkt. No. 127. In particular, NCsoft asserted that South Korean law provides that an employee's decision to resign from his employment can be considered involuntary **only if** there is evidence of "coercion" or "intimidation" on the part of the employer, and therefore an employee's resignation cannot be involuntary simply because the employer had a "unilateral intent" to terminate him and gave him "no option but to resign[.]" *See* Trial Tr., vol. 4, 1:1 – 2:17. The Court overruled this objection and gave the proposed instructions to the jury. *See id.* Later that same day, the jury returned a verdict for Plaintiff and awarded him $28 million.

NCsoft filed a renewed motion for judgment as a matter of law on August 13, 2010. *See* Dkt. No. 170.[1] NCsoft argued that no reasonable jury could have found for Plaintiff on his breach of contract claim. NCsoft did not address either the sufficiency of the evidence for the jury's damages award or the Court's decision to overrule NCsoft's objection to the jury instructions in this motion because it was a renewed motion for judgment as a matter of law. NCsoft therefore could not assert any ground for relief that it had not been able to assert in the preverdict motion that NCsoft had filed with the Court during the trial. *See* 9B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2521 (3d ed. 2008) ("As a Rule 50(b) motion is merely a renewal of the preverdict motion, it only can be granted on the grounds raised in the earlier motion."). Because NCsoft could not have known of the jury's verdict on damages or the Court's decision on jury instructions when it filed the preverdict

---

[1] NCsoft also requested a new trial pursuant to the Court's discretion under Federal Rule of Civil Procedure 50(b). *See* FED. R. CIV. P. 50(b)(2) (court may "order a new trial" in ruling on renewed motion for judgment as matter of law).

**DEFENDANT NCSOFT CORPORATION'S**
**MOTION FOR A NEW TRIAL OR, IN THE**
**ALTERNATIVE, TO ALTER OR AMEND**
**THE JUDGMENT**

motion, NCsoft did not address those issues in that motion.  On September 1, 2010, the Court denied NCsoft's renewed motion, and entered judgment consistent with the jury's verdict.

## ARGUMENT

### I.    LEGAL STANDARDS

Federal Rule of Civil Procedure 59 provides that a court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" FED. R. CIV. P. 59(a)(1).  The standard for granting a new trial is lower than the standard for granting a motion for judgment as a matter of law.  *See Hampton v. Magnolia Towing Co.*, 338 F.2d 303, 306 (5th Cir. 1964) ("A motion for a directed verdict (or a judgment n.o.v.) must be based on a complete absence of any evidence to warrant submission to the jury; whereas, a motion for a new trial concededly may be granted because the trial court concludes that the verdict is merely against the greater weight of the evidence") (internal quotation marks omitted) (quoting *Citizens Nat'l Bank of Lubbock v. Speer*, 220 F.2d 889, 891 (5th Cir. 1955)).

The Fifth Circuit has held that a new trial should be granted if the instructions given to the jury were erroneous.  *See Stine v. Marathon Oil Co.*, 976 F.2d 254, 261 (5th Cir. 1992) (reversing judgment and remanding for new trial where district court failed to instruct jury that defendant could not be liable unless it engaged in "gross negligence or willful misconduct."). In addition, the Fifth Circuit has held that a new trial should be granted if the amount of damages awarded by the jury is not supported by the evidence.  *See Eximco, Inc. v. Trane Co.*, 737 F.2d 505, 512 (5th Cir. 1984) (affirming district court order granting new trial on damages where "the jury could not have derived [the] damage figure from the evidence adduced."). Here, NCsoft is entitled to a new trial because the instruction the Court gave the jury on "voluntary resignation" was erroneous, and the amount of damages awarded by the jury was not supported by the evidence.

### II.   THE COURT SHOULD GRANT A NEW TRIAL BECAUSE THE INSTRUCTION ON "VOLUNTARY RESIGNATION" WAS ERRONEOUS

The Court may order a new trial due to erroneous jury instructions if the moving party "demonstrate[s] that the charge as a whole creates substantial and ineradicable doubt whether

the jury [was] properly guided in its deliberations." *Hartsell v. Dr. Pepper Bottling Co. of Tex.*, 207 F.3d 269, 272 (5th Cir. 2000), *quoting Johnson v. Sawyer*, 120 F.3d 1307, 1315 (5th Cir. 1997).  Here, the Court instructed the jury that an employee's decision to resign from his employment can be considered involuntary if the employer had a "unilateral intent" to terminate him and gave him "no option but to resign[.]"  Dkt. No. 161 at 6-7.  This instruction misstated South Korean law and failed to properly guide the jury in its deliberations.

South Korean law provides that an employee's decision to resign from his employment can be considered involuntary **only if** there is evidence of "coercion" or "intimidation" on the part of the employer.  *See supra* at 3-4; *see also* Ko Decl. ¶¶ 7-11.[2]  This standard is not unusual, and is in fact similar to what a plaintiff must prove to show that he was "constructively discharged" under Texas law.  *See Baylor Univ. v. Coley*, 221 S.W.3d 599, 604-605 (Tex. 2007) (affirming application of constructive discharge standard; "conditions so intolerable that a reasonable person in the employee's position would have felt compelled to resign").[3]

Accordingly, the Court's instruction on "voluntary resignation" was erroneous and failed to adequately guide the jury in its deliberations.  Due to the erroneous instruction, the jury apparently concluded that NCsoft's conduct met the lower "unilateral intent" and "no option but to resign" standard, as there was no evidence from which the jury could have

---

[2] *Compare* <u>Supreme Court of South Korea</u>, Case No. 92*Da*3809 (July 10, 1992) (employee's resignation was involuntary where he was "intimidated" by the defendant public corporation and the oppressive social climate at the time) *with* <u>Supreme Court of South Korea</u>, Case No. 2000*Da*51919 (Jan. 19, 2001) (plaintiffs who submitted resignation letter due to employer's poor business conditions did so voluntarily where there was no evidence of "deceit, threat, [or] coercion" on part of employer).  NCsoft has attached English translations of the South Korean authorities cited herein to the Declaration of Clayton Basser-Wall in Support of NCsoft's Motion for a New Trial or, in the Alternative, to Alter or Amend the Judgment.  NCsoft also has submitted in support of this motion a declaration from Chang Hyeon Ko, a Partner of the law firm of Kim & Chang in Seoul, South Korea.  *See* Declaration of Chang Hyeon Ko in Support of NCsoft's Motion for a New Trial or, in the Alternative, to Alter or Amend the Judgment ("Ko Decl").  NCsoft respectfully requests that the Court consider the Ko Declaration, particularly in light of the fact that the Court has previously considered a declaration from Guan Joong Kim, an attorney whom Plaintiff did not identify as an "expert" on South Korea law until four days before trial.

**DEFENDANT NCSOFT CORPORATION'S**
**MOTION FOR A NEW TRIAL OR, IN THE**
**ALTERNATIVE, TO ALTER OR AMEND**
**THE JUDGMENT**

**PAGE 6**

reasonably concluded that NCsoft had "coerced" or "intimidated" Plaintiff.  Indeed, Plaintiff admitted that NCsoft did not tell him that he would be "fired" if he did not agree to resign (he also admitted that NCsoft did not tell him that he was "fired," "terminated," or was being "laid off").  *See* Trial Tr., vol. 2, 134:24 – 137:7.[4]  For these reasons, NCsoft is entitled to a new trial. *See Banc One Capital Partners Corp. v. Kneipper*, 67 F.3d 1187, 1194 (5th Cir. 1995) (new trial where erroneous jury instructions "could have affected the outcome of the case").

## III.    THE COURT SHOULD GRANT A NEW TRIAL BECAUSE THE AMOUNT OF DAMAGES AWARDED BY THE JURY WAS NOT SUPPORTED BY THE EVIDENCE

The Court may order a new trial where the evidence presented was insufficient to support the amount of damages awarded.  *See Pletz v. Christian Herald Ass'n, Inc.*, 486 F.2d 94, 97 (5th Cir. 1973) (reversing damages award and remanding for new trial; "[w]hen the evidence as shown in the record . . . is insufficient to support the award, the jury's award would be erroneous and a new trial must be had.").  Here, the jury awarded Plaintiff $28 million.  The basis for the award appears to have been (i) Robert Garriott's testimony that he exercised his stock options "in June of '09" and sold all of the shares he obtained by doing so "in July and August"; and (ii) Dr. Jacobs' testimony that Plaintiff would have received an additional net gain of $28.2 million if he had exercised his options and sold his shares in the same manner as his brother.  *See* Trial Tr., vol. 2, 221:21 – 222:13; vol. 3, 28:23 – 31:22.  Based on this testimony, the jury apparently found that Plaintiff would have exercised his stock options – and would have sold the shares he received– at the same time as his brother if he had not been required to exercise them in February 2009, and that he therefore suffered damages in the amount of $28 million.  This finding was not supported by the evidence, and NCsoft is entitled

---

(...continued from previous page)

[3] Notably, each of the cases that Plaintiff submitted with his own brief on South Korean law either expressly used the terms "coercion" or "intimidation" or involved behavior on the part of the employer that plainly constituted such conduct.

[4] In addition, the phrase "gave the employee no option but to resign" could have further misled the jury to believe that in order for an employee's resignation to be voluntary, the employer must have given other options to the employee.  There is no such requirement under South Korean law.  *See* Ko Decl. ¶ 11.

to a new trial.  *See Massey v. Gulf Oil Corp.*, 508 F.2d 92, 98 (5th Cir. 1975) (affirming district court order granting new trial where "the amount of damages awarded by the jury was not supported by evidence of sufficient accuracy or reliability.").

There was no evidence introduced at trial indicating that Plaintiff would have exercised his options and sold the shares he obtained at the same time as his brother if he had been given the opportunity.  Indeed, Plaintiff did not testify that he would have exercised his options and sold his shares at the same time as his brother if he had not been required to exercise them in February 2009, nor did he proffer any documents indicating as such.  Similarly, Robert Garriott did not provide any such testimony.  Rather, Robert Garriott testified only that he had exercised his options "in June of '09" and sold the shares he had obtained "in July and August."  *See* Trial Tr., vol. 2, 221:21 – 222:13.  Robert Garriott did not testify that he believed his brother would have exercised his options and sold his shares in a similar manner if he had been given the opportunity.  Further, Plaintiff's own expert witness on damages, Dr. Jacobs, did not testify that Plaintiff would have exercised his options and sold his shares at the same time as his brother if he had been given the opportunity.  Rather, Dr. Jacobs testified only that **if** Plaintiff had exercised his options and sold his shares in the same manner as his brother, he would have received an additional net gain of $28.2 million.  *See* Trial Tr., vol. 3, 28:23 – 31:22.  Far from asserting that Plaintiff would have exercised and sold when his brother did, Dr. Jacobs testified that he believed it more likely that Plaintiff would have exercised and sold his shares in accordance with three other potential "scenarios."  Trial Tr., vol. 2, 261:7-23, 297:1-23.

Moreover, while Robert Garriott testified that he and Plaintiff always split their business ventures "50/50," and that he always handled the "business" side of those ventures (*see* Trial Tr., vol. 2, 183:24 – 185:15), there was no evidence introduced at trial indicating that Plaintiff ever followed Robert Garriott's lead or advice on financial matters.  To the contrary, the evidence showed that Robert Garriott and Plaintiff had different spending habits and financial practices.  For instance, Plaintiff testified at trial that he spent $20 million to take a trip to space (*see* Trial Tr., vol. 2, 37:3-5), and Robert Garriott testified that he believed this

**DEFENDANT NCSOFT CORPORATION'S**
**MOTION FOR A NEW TRIAL OR, IN THE**
**ALTERNATIVE, TO ALTER OR AMEND**
**THE JUDGMENT**

**PAGE 8**

was a "waste of money." *See id.*, 229:11 – 230:13.  Further, in an April 3, 2008 email that was introduced into evidence at trial, Robert Garriott informed Plaintiff that he did not want to be involved in Plaintiff's discussions with NCsoft concerning the financial difficulties that Plaintiff was experiencing due to the loan he taken out to finance his spaceflight.  *See* Def. Ex. 30.  There was no evidence presented at trial to support a finding that Plaintiff would have followed Robert's lead, exercised his options in "June of '09," and sold the shares he obtained during "July and August," if he had been given the opportunity.  *See Bush v. Texaco, Inc.*, 504 F.Supp. 670, 672-73 (E.D. Tex. 1981) (granting defendant's motion for new trial where evidence presented at trial showed only that plaintiff "had some muscle spasms and mild discomfort," but amount of damages awarded by jury implied finding that plaintiff had been "totally and permanently disabled").

For the reasons discussed above, the amount of damages the jury awarded Plaintiff on his breach of contract claim is not supported by the evidence that was introduced at trial, and is instead the product of pure speculation and guesswork.  Under South Korean law, damages may not be awarded based on mere speculation.  *See* <u>Supreme Court of South Korea</u>, Case No. 2001*Da*22833 (July 13, 2001) ("[a] creditor's claim for damages due to debtor's failure to pay has to be actual and concrete damages . . . whether such damages [have] actually been incurred and that [they are] actual and concrete shall be decided objectively and rationally based on social conventional notion").  Instead, an award of damages must be based on the evidence presented at trial and some reasonable and objective criteria.  *See* <u>Supreme Court of South Korea</u>, Case No. 2006*Da*21880 (Sept. 8, 2007) (trial court erred in finding that amount of damages plaintiff suffered due to defendant's overvaluation of fishery products was equal to amount owner of products paid defendant to overvalue them where there was no evidence indicating that amounts were "proportionately related" to one another).  Because the damages award here lacks sufficient evidentiary support, NCsoft requests that the Court order a new trial.  *See Eximco*, 737 F.2d at 512-13.  Moreover, South Korean law requires a plaintiff to show that the breach or the wrongful act proximately caused the damages sought.  *See* Ko Decl.

**DEFENDANT NCSOFT CORPORATION'S**
**MOTION FOR A NEW TRIAL OR, IN THE**
**ALTERNATIVE, TO ALTER OR AMEND**
**THE JUDGMENT**

**PAGE 9**

¶ 15.   In this instance, the damages awarded by the jury was not proximately caused by the shortened exercise period but rather by Plaintiff's decision to sell the stocks obtained from his exercise, which decision constitutes an intervening cause breaking the causal chain.

In the alternative, NCsoft requests that the Court alter or amend the judgment to reduce the amount of damages awarded to $1.8 million, which, as NCsoft's expert witness testified, reflects the amount by which the value of Plaintiff's stock options was reduced when NCsoft purportedly breached the SOA on November 11, 2008.  Under South Korean law, there are two types of damages available to an injured party:  (i) ordinary damages, which are "damages that may reasonably be expected to be incurred by the injured party"; and (ii) special damages, which are damages arising from special circumstances related to the breach.  *See* Ko Decl. ¶¶ 16-17.   Ordinary damages are measured at the time of the breach; special damages are measured at the time when the special circumstances occurred.  *See id.*  Special damages are not allowed unless the plaintiff is able to prove that the defendant knew or could have known at the time of the breach of the "special circumstances" that would occur in the future.  *See id.* ¶¶ 16-18.  In this instance, Plaintiff was required to prove that NCsoft knew or could have known that he intended to exercise his stock options and sell the shares he received at the same time as his brother (had he been given a longer period to exercise) and that the price of NCsoft stock at that time would be higher than it would be in February 2009.  Plaintiff did not proffer any such evidence.   In the absence of such evidence, Plaintiff would be entitled only to "ordinary damages," which for a breach of contract is the decreased value of the subject property measured as of the time of the breach.  *See* <u>Supreme Court of South Korea</u>, Case No. 2002*Da*12659 (Jan. 26, 2006).  Indeed, the Court here instructed the jury that it should award "ordinary damages" only.  *See* Dkt. No. 161 at 7-8.  The jury's award therefore exceeds the maximum amount the jury could have properly awarded.

## CONCLUSION

For all the foregoing reasons, NCsoft respectfully requests that the Court grant its Motion for a New Trial or, in the Alternative, to Alter or Amend the Judgment.

Dated:  September 8, 2010

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI


By:    /s/ Laura M. Merritt
  Laura M. Merritt (TX Bar No. 00791252)
  Jason M. Storck (TX Bar No. 24037559)
  Clay Basser-Wall (TX Bar No. 24054189)
  900 South Capital of Texas Highway
  Las Cimas IV, Fifth Floor
  Austin, Texas 78746-5546
  Telephone:  512.338.5400
  Facsimile:  512.338.5499

  Leo Cunningham (CA Bar No. 1216050)
  650 Page Mill Road
  Palo Alto, California 94304
  Telephone: 650.493.9300
  Facsimile: 650.493.6811

  **ATTORNEYS FOR DEFENDANT NCSOFT CORPORATION**

## CERTIFICATE OF SERVICE

  By my signature below, I certify that on this September 8, 2010, in accordance with the Federal Rules of Civil Procedure, I served the foregoing Defendant NCsoft Corporation's Motion for a New Trial or, in the Alternative, to Alter or Amend the Judgment, on counsel for Plaintiff, Stephen E. Fox (sfox@fr.com), Kelly D. Hine (kdh@fr.com), William Tommy Jacks (tzj@fr.com), John C. Sanders, Jr. (jsanders@fr.com), David Conrad (conrad@fr.com), Shelly Prim (prim@fr.com), and Dolores Puente (dzp@fr.com), at Fish & Richardson, via electronic mail.


  /S/Laura M. Merritt
  Laura M. Merritt

## CERTIFICATE OF CONFERENCE

I certify that I have complied with the meet and confer requirements of the Local Rules and that this Motion is opposed. Counsel for Plaintiff and Counsel for Defendant conferred regarding this Motion. Discussions ended at an impasse, leaving an open issue for the Court to resolve as set forth in the motion.

/s/Laura M. Merritt
Laura M. Merritt