United States Court of Appeals
Fifth Circuit

# UNITED STATES COURT OF APPEALS

**F I L E D**

October 21, 2011

Lyle W. Cayce
Clerk

# FOR THE FIFTH CIRCUIT

No. 10-50939

D.C. Docket No. 1:09-CV-357 *SS*

**FILED**

NOV 1 8 2011

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

RICHARD GARRIOTT,

     Plaintiff - Appellee

v.

NCSOFT CORPORATION,

     Defendant - Appellant

Appeals from the United States District Court for the
Western District of Texas, Austin

Before REAVLEY, ELROD, and GRAVES, Circuit Judges.

## J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

It is ordered and adjudged that the judgment of the District Court is affirmed.

IT IS FURTHER ORDERED that each party bear its own costs on appeal.

ISSUED AS MANDATE:     1 5 NOV 2011

A True Copy
Attest     1 5 NOV 2011

Clerk, U.S. Court of Appeals, Fifth Circuit

By: _____
            Deputy

New Orleans, Louisiana

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

October 21, 2011

Lyle W. Cayce
Clerk

No. 10-50939

RICHARD GARRIOTT,

Plaintiff-Appellee,

v.

NCSOFT CORPORATION,

Defendant-Appellant.

Appeals from the United States District Court
for the Western District of Texas

Before REAVLEY, ELROD, and GRAVES, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

NCsoft Corporation appeals a jury verdict awarding damages to its former employee, Richard Garriott, for breach of a stock options contract. NCsoft argues that the jury instruction misstated the governing Korean law, that the jury's verdict relied on legally insupportable evidence, and that the district court applied the wrong law when determining attorney's fees. Because NCsoft fails to demonstrate reversible error, we AFFIRM.

No. 10-50939

I.

A.

In 2001, Richard Garriott sold a computer game development company to NCsoft Corporation.[1]  In return, Garriott received compensation that included a stock options contract.  The options contract gave Garriott a ten-year period to exercise his options, creating a risk-free right to evaluate the progress of NCsoft stock.  NCsoft also employed Garriott as its executive producer of online games.

Seven years later, NCsoft decided to terminate Garriott's employment. The company also determined to shut down a computer game called Tabula Rasa—a poor-performing game that Garriott had developed.  By October 2008, NCsoft's founder and global CEO, T.J. Kim, directed the senior officer in North America, Chris Chung, to remove Garriott from the company.  Consequently, Chung told Garriott that after talking with Kim, they decided that Garriott's "time with NCsoft is over."  Garriott objected, said he did not want to leave, and asked if there was any way to appeal the decision.  Chung replied that NCsoft's executive management was involved in the decision, there was no possibility of appeal, and the decision was final.  Later that day, NCsoft sent Garriott a press release announcing his departure to Tabula Rasa fans.  Garriott reviewed and signed the announcement, which stated that "I am leaving NCsoft to pursue [other] interests."  NCsoft subsequently prepared a resignation letter for Garriott's signature addressed from him to the company, but Garriott did not sign the letter.

In December 2008, NCsoft informed Garriott that the company classified his departure as a voluntary resignation, rather than a forced termination. This distinction impacted the stock options contract, which provided that if

---

[1] We view the facts in the light most favorable to the jury verdict, as we must.

No. 10-50939

Garriott voluntarily resigned he must exercise his options within 90 days. Although Garriott had intended to hold his options until after NCsoft released a game called Aion to the market, the 90-day period required Garriott to exercise his options by a new date imposed by the company, which he did in January 2009. To meet this deadline, Garriott scrambled to raise enough money by obtaining loans from family members and business colleagues, liquidating personal holdings, and borrowing from his IRA.

### B.

Garriott sued NCsoft on May 5, 2009, claiming that NCsoft breached the options contract by classifying his discharge as a voluntary resignation, thereby forcing him to exercise his options prematurely.

During trial, Dr. Allen Jacobs presented different models of calculating Garriott's damages. Jacobs testified without objection that Garriott would have received an additional $46.3 million if he had been allowed to retain his options, basing the valuation on various scenarios of when Garriott could have exercised the options. Jacobs also testified without objection that Garriott's damages would have been $28.2 million if the jury believed that he would have exercised the options at the same time as his brother, Robert. Robert was the co-owner of the computer game company NCsoft purchased, he possessed identical stock options, and Robert exercised his options after NCsoft released its new game, which caused the stock price to rise dramatically. NCsoft made no objection to Jacobs's qualifications, his methodology, or the sufficiency of the underlying evidence.

At the close of trial, NCsoft objected because the district court did not include a proposed jury instruction that, under Korean law, an employee's resignation is deemed voluntary unless obtained through coercion or

No. 10-50939

intimidation.[2]  Regarding damages, the district court instructed the jury to calculate ordinary damages, including "any difference between the amount Mr. Garriott made selling his stock when he did and any amount he would have made exercising his stock options after February 9, 2009."  NCsoft failed to object to the damages instruction.

The jury returned a verdict that NCsoft terminated Garriott's employment and awarded him $28 million in damages.

## C.

After the verdict, NCsoft filed a motion for judgment as a matter of law, disputing the jury's verdict on breach of contract but not contesting the damages. The district court found more than sufficient evidence of Garriott's termination, and although NCsoft did not object to damages, the district court noted the "ample evidence" for the jury's award.  Specifically, Garriott's brother exercised his identical options in July and August of 2009 without being forced to do so, and the district court found evidence from which the jury could believe that Garriott would have sold his stock at the same time if given the opportunity.

Then, NCsoft filed a motion for new trial or to alter or amend the judgment, and Garriott moved for attorney's fees.  The district court addressed NCsoft's challenge, raised for the first time, that insufficient evidence supported the damages award because it was based entirely on speculation.  The district court pointed to its earlier finding that there existed sufficient evidence that Garriott would have exercised his options with Robert after Aion's release, and the record established that Garriott would have received an additional $28.2 million had he done so.  In addition, the district court looked at the evidence presented by Dr. Jacobs that alternative models would calculate a higher damages award.  Accordingly, the district court denied NCsoft's motion.

---

[2] The district court determined—and the parties agree—that South Korean law governs the contract claim.

4

No. 10-50939

Finally, the district court used Korean choice-of-law rules to apply Texas law in awarding Garriott $1,416,235.43 in attorney's fees. This appeal followed.

## II.

First, NCsoft contends that it is entitled to a new trial because the jury instruction erroneously stated the governing Korean law. Specifically, NCsoft argues that under Korean law a resignation is deemed voluntary unless the court finds that the employer used coercion or intimidation. The district court rejected NCsoft's jury instruction that would have required the jury to find either coercion or intimidation by NCsoft in order to decide that Garriott's departure was involuntary. This court reviews jury instructions for abuse of discretion. *Jowers v. Lincoln Elec. Co.*, 617 F.3d 346, 352 (5th Cir. 2010).

Having reviewed the case law provided by the parties, we agree with the district court that under Korean law coercion or intimidation are sufficient, but not necessary, conditions for an involuntary resignation. Half of the cases in the last decade that dealt with this issue have made no mention of coercion or intimidation. As the district court noted, it would be strange to conclude that NCsoft's alleged prerequisites are mandatory findings under Korean law when they are so often ignored by Korean courts. For example, the most recent Korean Supreme Court precedent held that the employees' resignations were involuntary in a case dealing with employer conduct similar to that of NCsoft, and the Court never mentioned a required showing of intimidation or coercion. Supreme Court, 2005Da38270, Nov. 25, 2005 (S. Kor.). In that case, the employer selected the employees for dismissal, demanded their resignation, and fired those who refused, much like how NCsoft selected Garriott for dismissal, told him that his time was finished, and insisted there was no possibility of appeal. Rather than holding that coercion or intimidation are prerequisites, the Korean Supreme Court issued a legal standard that mirrors the jury instruction

5

No. 10-50939

given by the district court below.[3] *See Julian v. City of Houston*, 314 F.3d 721, 727 (5th Cir. 2002) ("[I]f the charge correctly states the substance of the law, we will not reverse.").

Thus, NCsoft fails to establish that a finding of coercion or intimidation is a prerequisite for an involuntary resignation, and we hold that the district court did not abuse its discretion by excluding those elements from the jury charge.

## III.

Second, NCsoft argues for a new trial on damages because the jury award: (1) impermissibly includes stock appreciation after the breach; and (2) relies entirely on speculation.

We review the denial of a motion for a new trial for a clear showing of abuse of discretion. *Duff v. Werner Enter., Inc.*, 489 F.3d 727, 729 (5th Cir. 2007). In doing so, this court is "bound to accept all evidence in favor of the verdict as true and to give such evidence the benefit of all permissible inferences that would help sustain the jury's award." *Pletz v. Christian Herald Ass'n, Inc.*, 486 F.2d 94, 97 (5th Cir. 1973) (internal quotation marks omitted). We will not reverse the trial court's decision, unless NCsoft shows "an absolute absence of evidence to support the jury's verdict." *Duff*, 489 F.3d at 729 (quoting *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1049 (5th Cir. 1998).

## A.

NCsoft contends that damages for a stock options agreement must exclude post-breach stock appreciation, and therefore, it argues that none of Garriott's

---

[3] The Korean Supreme Court explained the legal standard: "When an employer terminates a labor contract relationship . . . by receiving a letter of resignation from an employee and if the employee had no choice but to prepare and submit the letter of resignation even though the employee had no intent to resign, such termination corresponds to a forced dismissal since the termination of the employment contract relationship is based on the employer's unilateral intent." Supreme Court, 2005Da38270, Nov. 25, 2005 (S. Kor.). In the present case, the district court's instruction stated "if an employer has a unilateral intent to terminate the employee and gave the employee no option but to resign, then his resignation is not of his own free [sic] and involuntary."

No. 10-50939

damages evidence is legally sufficient to support the verdict. Despite multiple opportunities to do so, NCsoft never raised this argument at trial.

A motion for a new trial or to amend a judgment "cannot be used to raise arguments which could, and should, have been made before the judgment issued." *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990) (quoting *FDIC v. Meyer*, 781 F.2d 1260, 1268 (7th Cir. 1986)). Here NCsoft attempts to do just that. For example, Dr. Jacobs presented various damages models to the jury—all without objection—that calculated Garriott's damages to be higher than the ultimate jury award. NCsoft could have filed a pre-trial *Daubert* motion, a motion in limine to challenge the sufficiency of the damages evidence, or objected to the supposedly insupportable testimony when it was introduced. Rather, NCsoft waited until after the verdict to attack Dr. Jacobs's methodology, contend that NCsoft's own expert provided the only permissible measure of damages, and then argue that the verdict must be excessive.

Had NCsoft raised these arguments, Garriott could have addressed its concerns at trial. Instead, NCsoft chose to wait and see what the jury would do. Displeased with the jury's decision, NCsoft now asks for a mulligan. Courts look skeptically at such claims for a do-over, especially in the context of a jury verdict. *See Nissho-Iwai Co., Ltd. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 619 (5th Cir. 1988) (noting "our respect for the jury as an institution and our concern that the party who persuaded the jury should not be stripped unfairly of a favorable decision"); *see also Risher v. Aldridge*, 889 F.2d 592, 595 (5th Cir. 1989) ("This Court does not look with favor upon tardy arguments that are brought to the lower court's attention post-trial after counsel has had the opportunity to salvage what she may from the record."). Indeed, to hold otherwise would transform the trial court into a trial run.

NCsoft gives no justification for its failure to object. Instead, it argues that the district court exercised its discretion to address the damages arguments in

the motion for a new trial and thereby preserved appellate review. *Quest Med., Inc. v. Apprill*, 90 F.3d 1080, 1087 (5th Cir. 1996) ("[A]n issue first presented to the district court in a post-trial brief is properly raised below when the district court exercises its discretion to consider the issue."). However, the district court only addressed NCsoft's speculation argument, which we examine below, and never considered NCsoft's arguments about post-breach appreciation. Accordingly, NCsoft did not properly raise its post-breach appreciation argument below.

We do not consider matters first raised on appeal except for plain error.[4] "Plain error is error so obvious and substantial that failure to notice it would affect the fairness, integrity, or public reputation of the judicial proceedings and would result in manifest injustice." *United States v. Delagarza-Villarreal*, 141 F.3d 133, 141 n.6 (5th Cir. 1997) (internal quotation marks omitted). We have held that manifest injustice is lacking "where a party raises for the first time on appeal an argument aimed at revising the method of computing damages." *Quest*, 90 F.3d at 1088. Indeed, it would be unjust to allow NCsoft to sit back during trial, observe Garriott's litigation strategy, and then demand a new trial on damages when it dislikes the verdict. Moreover, any alleged error is not sufficiently obvious in this case given that the Texas Supreme Court has observed that "time-of-breach damages may be inadequate when an employer

---

[4] We also arrive at plain error review if we characterize NCsoft's new argument as contesting the jury instruction, which allowed the jurors to calculate damages by considering "any amount he would have made exercising his stock options" after the breach. NCsoft never objected to that instruction as required by Rule 51 of the Rules of Civil Procedure. *See Jimenez v. Wood County, Tex.*, --- F.3d ----, 2011 WL 4837488, *3 (5th Cir. 2011) (en banc) ("Objections to the jury instructions must be made . . . after the court announces its proposed instructions, and before the instructions and arguments are delivered."). "Where a proper objection is not made . . . our review of a jury instruction challenge is limited to review for plain error." *Id.*

anticipatorily repudiates an option agreement."[5] *Miga v. Jensen*, 96 S.W.3d 207, 216 (Tex. 2002). Therefore, we reject this challenge to the jury verdict. *See Jimenez v. Wood County, Tex.*, --- F.3d ----, 2011 WL 4837488, *4 (5th Cir. 2011) (en banc) (declining to decide the question of error "because any error in this regard was not plain").

## B.

NCsoft also argues for a new trial on damages because the jury had a complete absence of evidence, absent speculation, to determine when Garriott would have exercised his options. Unlike the argument dealing with post-breach appreciation, the district court discussed NCsoft's speculation challenge when denying the motion for a new trial. By so doing, the district court exercised its discretion to address the potentially waived argument and preserved the issue for appeal. *See Quest*, 90 F.3d at 1087.

Although damages based on when Garriott might have sold his shares may be too speculative if based on "assumptions without basis in the real world," *In re Air Crash Disaster at New Orleans*, 795 F.2d 1230, 1233 (5th Cir. 1986), Garriott need not prove damages with mathematical certainty, *Meyers v. Moody*, 693 F.2d 1196, 1215 (5th Cir. 1982). In fact, the jury's verdict of $28 million mirrors the lowest measurement from the various damages models in Dr. Jacobs's testimony—evidence that NCsoft allowed without objection. Moreover, NCsoft does not dispute that Garriott would have received an additional $28.2 million had he exercised his options with his brother. And the district court found ample evidence for the jury to believe that Garriott would have exercised

---

[5] NCsoft's damages theory apparently is based on its view that it could force Garriott to exercise his ten-year options with a premature deadline, and then limit Garriott's damages to the date chosen by NCsoft itself. In fact, the record shows that the company had previously requested Garriott to exercise his options early "for the sake of the company," but Garriott refused. Thus, NCsoft's damages theory would allow NCsoft to acquire by force the exercise of shares it could not obtain by persuasion.

9

No. 10-50939

his options with Robert after the release of Aion. For example, Garriott and Robert have been in business together since 1982, all of their business ventures are split 50/50, and Robert has always managed the financial aspects of the relationship. In addition, the jury heard Garriott's testimony of his intent to exercise the options after Aion's release, and of his actual conduct in selling his remaining NCsoft stock after the release date.

Given the amount of evidence supporting the verdict—presented to the jury without objection—we hold that the district court did not abuse its discretion in denying NCsoft's motion for a new trial on damages.

## IV.

Finally, NCsoft objects to the district court's award of attorney's fees under Texas law, arguing that Korean law should apply to limit the award.

When deciding the appropriate law governing attorney's fees, the district court determined that the parties contracted for Korean choice-of-law rules, which called for Texas law to govern attorney's fees in this case. Then, the district court applied Texas law to carefully reduce the initial claim of $7.4 million in fees to the final $1.4 million award. NCsoft does not dispute that the award would be proper under Texas law. Instead, NCsoft argues that the district court erred by not applying Korean law for attorney's fees.

We need not decide, however, whether the district court erred in this choice-of-law analysis because the result would be the same under either Korean or Texas law. Although Korean law generally provides caps on attorney's fees, these caps are not mandatory.[6] Instead, Korean law would allow Garriott to receive additional attorney's fees that are in line with social norms and have a

---

[6] In its brief, NCsoft misrepresents that "the District Court recognized [that] under Korean law Garriott would be entitled to a *maximum* recovery of $423,558.64." (emphasis in original). This is simply false. To the contrary, the district court cited Korean legal authorities that would entitle Garriott to additional attorney's fees and concluded "Thus, there is no reason, in either Texas or South Korean law, to limit fees [to the $423,558.64]."

10

No. 10-50939

substantial causal relationship with the litigation. In determining the $1.4 million award, the district court significantly reduced Garriott's $7.4 million of fees, ensuring that the final award complied with social norms and bore a causal relationship to the litigation. Therefore, we agree with the district court that even if Korean law applied, Garriott would be entitled to the award of attorney's fees.

## V.

NCsoft fails to prove that the district court abused its discretion in excluding a requirement of coercion or intimidation from the jury instructions. Moreover, the district court did not abuse its discretion in denying NCsoft's motion for a new trial on damages. Finally, the award of attorney's fees would be permitted under either Texas or Korean law. For the foregoing reasons, the judgment of the district court is AFFIRMED.

15 NOV 2011

11